**EXHIBIT E**

*Jennifer Christos vs.*

*Halker Consulting, LLC, et al.*

*Video Deposition of Travis Hutchinson*

*November 08, 2016*



700 17th Street, Suite 1750
Denver, CO 80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

Stevens-Koenig Reporting

Jennifer Christos vs.
Halker Consulting, LLC, et al.

Video Deposition of Travis Hutchinson
November 08, 2016

```
 1           IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
 3   Civil Action No. 16-CV-01838-PAB-NYW
 4   JENNIFER CHRISTOS,
 5   Plaintiff,
 6   vs.
 7   HALKER CONSULTING, LLC, a Colorado Limited Liability
     Company, MATTHEW HALKER, individually, and
 8   TRAVIS HUTCHINSON, individually,
 9   Defendants.
     ---------------------------------------------------------
10           VIDEO DEPOSITION OF TRAVIS HUTCHINSON
                       November 8, 2016
11   ---------------------------------------------------------
12   APPEARANCES:
13   ON BEHALF OF THE PLAINTIFF:
                 RACHEL E. ELLIS, ESQ.
14               Ellis Employment Law, LLC
                 1725 High Street, Suite 3
15               Denver, Colorado  80218
                 Phone:  720-465-6972
16               Email:  rachel@ellisemploymentlaw.com
17   ON BEHALF OF THE DEFENDANTS:
                 BRETT M. WENDT, ESQ.
18               Kutak Rock LLP
                 1801 California Street, Suite 3000
19               Denver, Colorado  80202
                 Phone:  303-292-7868
20               Email:  brett.wendt@kutakrock.com
21
22   Also Present:  Jennifer Christos
23
24
25
```

Page 2

```
 1       PURSUANT TO WRITTEN NOTICE, and the appropriate
 2   rules of civil procedure, the video deposition of TRAVIS
 3   HUTCHINSON, called for examination by the Plaintiff, was
 4   taken at 1721 High Street, Denver, Colorado, commencing
 5   at 9:16 a.m. on November 8, 2016, before Linda L.
 6   Frizzell, a Notary Public and Registered Professional
 7   Reporter in and for the State of Colorado.
 8       (Deposition was videotaped by Ms. Ellis.)
 9                        I N D E X
10
     EXAMINATION:                                        PAGE
11
     By Ms. Ellis                                         3
12   By Mr. Wendt                                         151
13
14   EXHIBITS:                                           PAGE
15   1    LinkedIn Profile                                7
16   2    Halker Consulting, Inc.,                        16
          Employee Handbook March 7,
17        2013/Bates Labeled Christos
          0048-0078
18
     3    Memorandum to Project                           46
19        Managers/Bates Labeled
          Christos 0082-0084
20
     4    Mr. Lowry's Notebook/Bates                      67
21        Labeled Christos 0112-0295
22   5    Matrices/Bates Labeled                          101
          DEFS_0037-0044
23
     6    April 23, 2015, Email Project                   141
24        Group Reduction/Bates Labeled
          DEFS_0045-0052
25
```

Page 3

1   (Ms. Christos not present.)
2   P R O C E E D I N G S
3       TRAVIS HUTCHINSON,
4   having been first duly sworn, was examined and testified
5   as follows:
6       EXAMINATION
7   BY MS. ELLIS:
8       Q. All right. Mr. Hutchinson, I'm Rachel
9   Ellis. I am Jennifer Christos' attorney. And we're here
10  today to take your deposition.
11      Before we talk about the facts in the case,
12  let's talk about your familiarity with the deposition
13  process. Have you had your deposition taken before?
14      A. No, ma'am.
15      Q. You understand that our court reporter,
16  Linda, has just placed you under oath, and you have an
17  obligation to testify truthfully?
18      A. Yes, ma'am.
19      Q. Do you understand that even though we're in
20  a conference room as opposed to a courtroom, your
21  testimony has the same force and effect as if you were
22  testifying before a judge or a jury?
23      A. Yes, ma'am.
24      Q. Do you understand that you will be
25  committing perjury if you know the answer to a question

Page 4

1   but you testify that you don't know the answer?
2       A. Yes, ma'am.
3       Q. And that you will be committing perjury if
4   you know the answer to a question but you say you don't
5   remember the answer?
6       A. Yes, ma'am.
7       Q. I want your best testimony today to make
8   the best use of all our time. And so if you don't
9   understand a question or you think I'm asking you
10  something that is ambiguous, I want you to tell me, and I
11  will rephrase the question. Does that make sense?
12      A. Yes, ma'am.
13      Q. A deposition is not an endurance test. So
14  if you need to take a break for any reason, just let us
15  know and we can go off the record. But I do ask that you
16  not take a break while a question is pending.
17      Have you consumed any medication, alcohol,
18  or other substance which would interfere with your
19  ability to respond to the questions or understand them
20  today?
21      A. No, ma'am.
22      Q. Is there any other reason you would be
23  unable to testify today?
24      A. No, ma'am.
25      Q. What did you do to prepare for this

Jennifer Christos vs.
Halker Consulting, LLC, et al.

Video Deposition of Travis Hutchinson
November 08, 2016

Page 97

1 pay and for that reason, you decided to cease the
2 advisory board meetings?
3     A. That was one of the drivers. Didn't feel
4 it was fair to ask them to put in their time and energy
5 reviewing material and prepping.
6     Q. What types of things would the advisory
7 board review in prep for prior to the meetings, what
8 topics?
9     A. We'd give general status update of company;
10 financial performance; work outlook; kind of the big
11 things we were trying to do within the company.
12     Q. Was the advisory board included in
13 conversations about reduction in force?
14     A. Yes.
15     Q. Were there minutes from these advisory
16 board meetings?
17     A. Not to my knowledge.
18     Q. Were these meetings in person since
19 somebody was flying in?
20     A. Yes, ma'am.
21     Q. Was there anybody taking notes during these
22 meetings?
23     A. No, ma'am. Not a formal board.
24     Q. Did you personally take notes during these
25 meetings?

Page 98

1     A. I did take notes during a few of them.
2     Q. And why is that?
3     A. Frankly, Craig Hughes had a lot to provide
4 as far as perspective on how to run a company, gone
5 through a downturn, how to manage through that. I think
6 always trying to educate yourself and learn from other
7 lessons and draw on that experience. Nobody wants to go
8 through a downturn, but hopefully you can learn from
9 others.
10     Q. And were advisory board members giving
11 Halker advice on how to manage this downturn?
12     A. No. I'd say it was a sounding board.
13     Q. What do you mean "a sounding board"?
14     A. We present initiatives or what we were kind
15 of planning to do or the company was at, and they would
16 ask questions to help shape different perspectives and
17 talk about their experiences.
18     Q. Did someone from Halker present the idea of
19 a reduction in force to the advisory board at some point?
20     A. I'm sure.
21     Q. Is that something that came from you?
22     A. It was generally David and I putting
23 together slide decks, so a combination.
24     Q. You mean slide decks in, like, a PowerPoint
25 presentation?

Page 99

1     A. Uh-huh. Yes, ma'am.
2     Q. So you think that Halker started talking
3 about reduction in force in 2014?
4     A. I would say started doing some RIFs in
5 2014.
6     Q. What month?
7     A. Second half of the year.
8     Q. And were there layoffs that took place at
9 Halker that were larger than others?
10         MR. WENDT: Object to form and foundation.
11 You could answer.
12     A. I'm sure the headcount did not exactly
13 match each time.
14     Q. (By Ms. Ellis) Was there discussion at
15 any point about some kind of plan, like, We're going to
16 get rid of 10 percent of our force or 10 percent this
17 time or 10 percent -- I mean, were there any numbers
18 like that?
19     A. I'd say combination of financial, VP of
20 finance providing some targets of where we needed to be
21 to be a healthy company. And managers looking at
22 resource load and employee counts to be able to execute
23 the work.
24     Q. Were there any layoffs at Halker that took
25 place in the first quarter of 2015?

Page 100

1     A. Yes, ma'am.
2     Q. What month?
3     A. I believe in 2015. There was layoffs in
4 January. And then again in the second quarter.
5     Q. About how many people were laid off in
6 January?
7     A. Not -- my gut answer would be about a
8 dozen.
9     Q. And what part of the company were those
10 layoffs in?
11     A. I think it was throughout all the
12 disciplines. I do know process engineering was able to
13 retain headcounts the longest. I'd say that it was kind
14 of all the disciplines slowly. As project cycles would
15 end, and there's not new work, reductions in forces had
16 to happen to sustain the company.
17     Q. Was there new work coming into Halker at
18 the beginning of 2015?
19     A. There was work coming in but it was slower
20 than it was getting worked through. So there's always a
21 decline in revenue starting in 2014, beginning of 2014.
22     Q. What do you mean it was slower getting
23 worked through?
24     A. So if -- based on headcount if you're
25 working 1,000 hours a week, we're only bringing in 500

Jennifer Christos vs.
Halker Consulting, LLC, et al.

Video Deposition of Travis Hutchinson
November 08, 2016

Page 101

1 hours a week. So you have a certain amount of backlog of
2 work that you're just chewing through continually in a
3 shrinking company.
4    Q. Was there a formal process for determining
5 who would be included in layoffs?
6       MR. WENDT: Object to form and foundation.
7    A. I'd say there was a -- during layoffs in
8 2015, had to put in place -- the managers were using some
9 employee-ranking matrices within their departments to
10 help identify.
11    Q. (By Ms. Ellis) What are these matrice --
12    A. Matrices. It was -- it was something that
13 Eric Parvin had brought to the table from his days at
14 URS.
15       MS. ELLIS: Let's mark this as Exhibit 5.
16       (Exhibit 5 marked for identification.)
17    Q. Is this an example of the matrix you were
18 just talking about?
19    A. Yes, ma'am.
20    Q. All right. On page 1 of what's been marked
21 as Exhibit 5, there appear to be ten categories that
22 employees were graded on. Would you say that's accurate?
23    A. Nine.
24    Q. Okay. What do you think employees were not
25 graded on?

Page 102

1    A. I don't think we were using the success
2 factors at this time.
3    Q. Okay. Is this directly a thing that
4 Mr. Parvin brought or was this modified for use at
5 Halker, as far as the categories go?
6    A. Like, I can't say exquisitely. I know he
7 brought the matrix, really looked to the individual
8 department managers to make it work for their groups.
9    Q. What does success factors mean?
10    A. That was our HR platform for a while, just
11 the name of an SAP software.
12    Q. What is "SAP software"?
13    A. I -- SAP does a whole bunch of different
14 work-related platforms.
15    Q. So --
16    A. Kind of like an automated tool.
17    Q. So what did success factors include?
18       MR. WENDT: Object to form and foundation.
19 I think he testified it wasn't used.
20    Q. (By Ms. Ellis) Let me rephrase. You said
21 success factors was an HR platform. What kind of
22 information was captured within success factors as far
23 as employee performance?
24    A. At the time of this, I really don't think
25 it was being used.

Page 103

1    Q. Prior to this matrix which, I think, was
2 capturing information from March 2015 -- so let me go
3 back -- let me go back a year.
4       In 2014, did employees have annual reviews?
5    A. As -- as a discipline, as a company, that
6 was something that we tried to keep up with, yes.
7    Q. Did all annual reviews take place in a
8 specific time frame for the company?
9    A. As a growing company that was something
10 that I don't think folks -- we ever really decided on
11 whether it was annual or employee date or something
12 getting worked through. I think we encouraged managers
13 to give continual feedback and meet with their employee
14 on a regular basis, kind of an annual review by itself is
15 not that effective.
16    Q. In 2014, were you giving your -- were you
17 giving people who directly reported to you an annual
18 review?
19    A. I would say, yes.
20    Q. All right. As far as how to use this chart
21 in order to give different employees weights, where are
22 the instructions for what each category includes?
23       MR. WENDT: Object to form and foundation.
24    A. A -- I cannot speak to if there's
25 instructions or not.

Page 104

1    Q. (By Ms. Ellis) Were your managers that
2 directly reported to you using charts to rank
3 employees?
4    A. Such as this, yes.
5    Q. Did you talk to your managers about how to
6 use the charts?
7    A. We discussed the importance of continually
8 understanding where the employees were. And to be
9 keeping up with the discipline.
10    Q. What do you mean "keeping up with the
11 discipline"?
12    A. Doing it on a monthly basis. Again, an
13 unfortunate period of time when the company was going
14 through downsizing and RIFs.
15    Q. If you turn to DEFS_40, which is a Bates
16 stamp at the bottom. This document looks pretty similar
17 to me, although it says "April" instead of "March" at the
18 first page.
19    A. Uh-huh.
20    Q. Do you think that March was the first time
21 that employees were ranked using this chart?
22    A. I'm unsure.
23    Q. Did you instruct your managers to use these
24 charts on a monthly basis?
25    A. In the managers' meetings, yes, it was

Jennifer Christos vs.
Halker Consulting, LLC, et al.

Video Deposition of Travis Hutchinson
November 08, 2016

Page 105

1 talked that Eric had a tool, that he would share the tool
2 and to use the tool.
3     Q. And did you want these reports given to you
4 or these charts given to you on a monthly basis so that
5 you could take a look at these numbers?
6     A. No, ma'am.
7     Q. What happened to these charts once they
8 were filled out?
9     A. My understanding is they're shared, one, if
10 there are subsupervisors in the group, the supervisors
11 worked with the department managers to generate them.
12 And, I believe, at times they're shared with HR.
13     Q. But not shared with you?
14     A. When -- when RIFs occurred, it would -- you
15 know, request that managers working with HR have proper
16 documentation as far as who was selected. I'd be
17 apprised of who the managers had selected for their RIF
18 at the same time as HR.
19     Q. Does it make sense to you that March and
20 April would be identical?
21     MR. WENDT: Object to form and foundation.
22     A. Frankly, it's hard to know looking at this.
23 As a spreadsheet user, generally, when you are doing the
24 next month, you copy the previous month's tab first and
25 then you start populating. So at the point in time when

Page 106

1 this is printed or -- so I don't know. It's hard to
2 know.
3     Q. (By Ms. Ellis) Who would know?
4     A. I would say the subsupervisors and the
5 department manager for -- for this group.
6     Q. And the department manager was?
7     A. Tyler Farley.
8     Q. Who were the subsupervisors?
9     A. Brianne, Greg, and Craig.
10     Q. In discovery, there's a statement that
11 Mr. Halker and Mr. Hart provided company targets for the
12 number of employees to be included in the layoffs for the
13 May 2015 layoff. What was your role in deciding who
14 would be included in the layoff?
15     MR. WENDT: Can we stop for a second? Did
16 you say Mr. Halker and Mr. Hart? I believe the answer is
17 Mr. Hutchinson and Mr. Hart. So I want to make sure you
18 are quoting that right, because if you're quoting it from
19 a response, I want to know.
20     Q. (By Ms. Ellis) Well, Mr. Hutchinson, who
21 provided company targets for the number of employees to
22 get included in layoffs?
23     A. From a financial matrix standpoint, that
24 would come from David.
25     Q. Anyone else?

Page 107

1     A. I mean, again, Matt is involved as the
2 owner of the company. David was the most intimate with
3 the financials and the adjustments needed to make to --
4 to get the company back to a solvent state. So I'd say
5 hard matrix would come from David.
6     Q. All right. What was your role?
7     A. I took the targets and provided those to
8 the department managers and talked through that the
9 company's hemorrhaging money, and we are in the
10 unfortunate position of having to do layoffs; otherwise,
11 everyone is going to be out of a job. This isn't a
12 position that anyone wants to be in. But these are the
13 targets we need to hit. Please get back, get with your
14 subsupervisors, if you have any, look at your groups and
15 provide recommendations back as far as how you can hit
16 these targets.
17     Q. All right. Did you have any input into who
18 would be included in layoffs?
19     A. As -- as their manager, we really looked to
20 them to provide the path for their group. They're the
21 most intimate with their teams and their teams'
22 performance. I know there was continual dialogue as far
23 as how to hit the numbers. It's a very-not-fun period of
24 time. So continued support to the managers was -- was
25 provided.

Page 108

1     Q. What do you mean continual dialogue about
2 how to hit the numbers?
3     A. No manager wants to be handed a target that
4 says you have got to get rid of X amount of folks.
5 It's -- you know -- again, we're a company that -- that's
6 trying to retain a good culture and environment and it's
7 very difficult to do in a layoff. And so I'm going to
8 provide support to my managers who have to look at their
9 teams and make tough decisions.
10     Q. Did you give anybody any guidance about any
11 individuals that you wanted to see --
12     A. No, ma'am.
13     Q. -- on one side of the layoff or the other?
14     A. No, ma'am. Our company had a lot of
15 autonomy, and I would not intentionally interfere with
16 what my managers' decisions are in regards to their
17 resources.
18     Q. Regarding Ms. Farley specifically, did you
19 give her any guidance about who you wanted to see
20 included or not included?
21     A. No, ma'am.
22     Q. Did Ms. Farley consult with you about who
23 should be included or not included?
24     A. No, ma'am. She consulted with Craig, Greg,
25 and Brianne.

Jennifer Christos vs.
Halker Consulting, LLC, et al.

Video Deposition of Travis Hutchinson
November 08, 2016

Page 109

1     Q. In the context of a layoff?
2     A. Yes. Because they had those three
3 reporting in to Tyler. Tyler had the target to hit as a
4 department; those three had the direct reports, and so
5 they were involved in cross-ranking the rest of the
6 group.
7     Q. So did Ms. Farley rank Mr. Melton and
8 Mr. Campbell and Ms. Stebbins?
9     A. That is my understanding.
10    Q. And were Mr. Melton, Mr. Campbell, and
11 Ms. Stebbins told that they were selecting candidates for
12 inclusion in a layoff?
13    A. I do not know the answer to that.
14    Q. Is it your testimony today that it is
15 Ms. Farley who made the decision to include
16 Ms. Christos -- Christos in the layoff?
17    A. Yes.
18    Q. Did she have the authority to do that
19 without your approval?
20    A. The hierarchy to the company -- so I mean,
21 she was given that autonomy as all the managers were to
22 make the decisions for their groups.
23    Q. Did she have the authority in her role to
24 make hiring decisions without your approval?
25    A. I don't think she ever got the opportunity

Page 110

1 to hire anybody.
2     Q. Did Ms. Farley have the authority to fire
3 anyone in her group without your approval?
4     A. Again, hierarchy of the company, talking
5 with all the managers, I'm sure things would have been
6 talked over if someone was going to get fired.
7     Q. So she didn't have the authority to fire
8 someone without your approval?
9     A. It's -- you know, working through at HR, I
10 don't know if anybody had a singular authority to fire an
11 individual at the company without working through the
12 proper channels. But I don't -- I don't know how to
13 place the -- the singular authority. You know, anyone
14 can -- could recommend to -- to fire or higher anybody,
15 we had a -- you know, an employee referral bonus for a
16 period of time when we were hiring, which there would be
17 people recommending to hire folks; that was afforded to
18 everybody.
19    Q. When was the employee referral bonus
20 program put in place?
21    A. Probably 2013. When the industry was good.
22    Q. If you turn to the last page of what's been
23 marked as Exhibit 5. Are these -- is this the underlying
24 data behind the rankings?
25      MR. WENDT: Object to form and foundation.

Page 111

1     A. I -- I was not a user of the spreadsheet.
2 I can't -- I can't speak to that.
3     Q. (By Ms. Ellis) Did you read the comments
4 that are included in this exhibit?
5     A. I have not exhaustively read the comments.
6     Q. Have you read them prior to today?
7     A. No, ma'am.
8     Q. When did you first meet Craig Melton?
9     A. Probably a few weeks before his hire date
10 when he was interviewing.
11    Q. When did you first meet Greg Campbell?
12    A. Similar.
13    Q. When did you first meet Brianne Stebbins?
14    A. When at school at Colorado School of Mines.
15    Q. Did you refer her to Halker?
16    A. I did.
17    Q. When did you first meet Rick Gonzales?
18    A. During the interview process before he was
19 hired.
20    Q. When did you first meet Alex da Silva?
21    A. The same.
22    Q. Interview process?
23    A. Uh-huh.
24      MR. WENDT: Yes?
25    A. Yes.

Page 112

1     Q. (By Ms. Ellis) When did you first meet --
2 thank you.
3      When did you first meet C.J. Horn?
4     A. Elementary school.
5     Q. Did you refer him to Halker?
6     A. I did.
7     Q. When did you first meet Michael Molter?
8     A. Interview process.
9     Q. When did you first meet Tyler Farley?
10    A. Colorado School of Mines.
11    Q. Did you refer her to Halker?
12    A. I did.
13    Q. When did you first meet Dale Sostrom?
14    A. The interview process.
15    Q. And when was he hired at Halker?
16    A. I know it was -- I believe it was beginning
17 of -- maybe January of '15.
18    Q. January 2015?
19    A. Yes, ma'am.
20    Q. Was he out of the people that are named or
21 identified on this -- on the first page of Exhibit 5, was
22 Mr. Sostrom the latest person to be hired?
23    A. Not 100 percent sure. It was either him or
24 Richard.
25    Q. When do you think that Mr. Sostrom was